**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| JACQUELINE JONES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:22-cv-1477 |
| | § | |
| CITY OF DALLAS, TEXAS | § | |
| | § | |
| Defendant. | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOWS, Plaintiff Jacqueline Jones (hereafter collectively referred to as "Plaintiff" or "Jones"), by counsel and brings this action for violations of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.,* for race discrimination, retaliation and disability discrimination, complaining of Defendant City of Dallas (hereafter referred to as "Defendant" or "City") and respectfully show the Court as follows:

### I.

### PARTIES

1.01.   Jacqueline Jones is an individual, who is a citizen and resident of the State of Texas, who may be contacted through her undersigned counsel of record.

1.02.   Defendant, the City of Dallas, Texas is a municipality/political subdivision in Dallas County and may be served by delivering citation to T.C. Broadnax, Dallas City Hall, 1500 Marilla Street, Dallas, TX 75201.

## II.

## JURISDICTION AND VENUE

2.01. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331. This Court has supplemental jurisdiction of Plaintiff' state law claims.

2.02. Venue for all causes of action stated herein lies in the Northern District of Texas because a substantial part of the events alleged in this Complaint took place within this District. *See* 28 U.S.C. § 1391(b). Plaintiff's EEOC charge was filed in the Dallas District office of the EEOC. Plaintiff received her Notice of Right to Sue and has timely filed this lawsuit.

## III.

## FACTUAL ALLEGATIONS

3.01. Plaintiff is an African-American/Black female who was hired by the Defendant in its City Manager's Office on or about September 28, 2000. Her last position held was Contract Solutions Specialist. Her duties were numerous, and she consistently received good performance reviews.

3.02. Plaintiff suffers from medical conditions, including but not limited to asthma and PTSD, as a result of her military service, and was rated at 80% disability in 2016 by the Veterans Administration. She was formerly a Captain in the Army. Defendant was aware of Plaintiff's status during her employment with it. Plaintiff's respiratory conditions make her susceptible to sprays, perfumes, and other aromatic substances, which can cause respiratory distress.

3.03. Plaintiff received approval from Defendant for intermittent leave under the Family Medical Leave Act (FMLA), effective May 4, 2018 through November 4, 2018, with an extension for same effective November 5, 2018 through May 5, 2019, allowing Plaintiff to attend regularly-scheduled physician and psychologist appointments to treat her chronic conditions.

3.04    Plaintiff had previously filed a federal lawsuit alleging discrimination against minority women in promotion opportunities. On August 8, 2018, Plaintiff's ended adversely to her.

3.05.   On or about August 19, 2018, Plaintiff submitted an application for Contract Solutions Specialist but was told she was being assigned to the position, rather than having to apply for it. She was offered a three-percent pay increase, rather than the actual pay grade held by a similarly-situated White women. The offer of the three-percent increase was rescinded, however, when Plaintiff complained that her pay should be the same as the others.  The comparator, Ms. Davidson, had the same level experience with contracts.

3.06.   In September of 2018, Plaintiff was moved out of an enclosed cubicle environment to a completely open office area. Plaintiff was provided with a small desk that forced her knees to hit the desk because she wore knee braces. She was two feet away from a co-worker's desk, and aisles were always busy, unlike in her previous cubicle. Among other things, Plaintiff suffers from PTSD from giving her service in the Bosnian War. These new working conditions triggered her anxiety due to past trauma, making her everyday work environment unhealthy and unaccommodating. The desks were situated so that employees had to be approached from behind and face a brick wall with holes all over it which triggered her anxiety. She was placed near a water fountain, copy machine, and in the middle of two departments which meant that she must listen to doors slam all day long, which triggered PTSD anxiety attacks. Additionally, her peers would bring candles and incense, wear heavy perfume, and spray chemicals in the air that made her sick daily due to allergies and asthma.

3.07.   Plaintiff met with her immediate Supervisor, Ms. Ericka Johnson ("Ms. Johnson") regarding the dangers of Plaintiff's exposure to air-borne chemicals. Johnson informed Plaintiff

that others had a right to use whatever chemicals they wanted to in their desk spaces. Plaintiff then met with HR Supervisor Vanessa Jones ("Ms. V. Jones") and showed Ms. V. Jones an accommodation letter from Plaintiff's doctor requiring protection from aerosols of any kind. Ms. V. Jones replied that the letter had expired and needed to be renewed. No other action was taken to protect Plaintiff from air-borne chemicals.

3.08.    During all these events, Plaintiff was on FMLA intermittent leave for service-connected injuries and receiving treatment at the Dallas VA. In October of 2018, Plaintiff's Psychologist, VA Primary Care Doctor, and Civilian Primary Care Doctor had noticed that her health had been declining. Vanessa Jones furnished Reasonable Accommodation Forms for these doctors. Dr. Xuang Lee submitted a form regarding accommodation about Plaintiff's desk situation. Dr. Naira Babain completed the form about Plaintiff's non-exposure to respiratory conditions requirements. Finally, Dr. Ashton Steele recommended an enclosed space like the one Plaintiff had before, or the ability to work from home. Plaintiff approached Janice Rusher, HR Representative, regarding this conclusive information and was greeted with a listening ear but no resolve. Vanessa Jones was equally elusive in offering effective accommodations, suggesting that Plaintiff move to another back-facing desk in the same environment. Vanessa Jones also stated that the department did not permit working from home, ignoring the well-known fact that individuals did work from home and that Angela Cadillo even obtained a checkout laptop for working from home. Johnson also sent out emails to the staff when she was working remotely, contradicting Vanessa Jones' statement.

3.09    Other employees were able to receive accommodations, indicating a retaliatory intent.  For example, on November 7, 2018, in a lunchtime meeting, T.C. Broadnax, City Manager, told a story about how he had to make an unpopular decision to block engineers from using

generators on the city plaza because Broadnax has asthma. Plaintiff has Asthma and Allergic Rhinitis, but HR, Johnson, and Assistant City Manager Nadia Chandler-Hardy would not lift a finger for Plaintiff's reasonable and unobtrusive accommodation requests, although they had the power to do so. During that meeting, Amy Thomas voiced a complaint regarding Supervisor Johnson as well. Her complaint, however, was met with accommodations. She was moved to the office that the former Chief of Community Services had occupied, even though her accommodation request was not even due to pressing health issues like Plaintiff's. Similarly, Wei-Lin (Sunny) Wang asked to be moved to a quieter area because it affected her thinking and she was moved rather quickly even though she did not have a legitimate disability to accommodate.

3.10. After the conclusion of Plaintiff's earlier lawsuit and Plaintiff requested equal compensation for the skill level of her promotion, Johnson had become highly critical and demeaning of her. She hosted a work environment that became very toxic, with constant intimidation and harassment. These hostile conditions climaxed on November 30th, 2018, when Johnson and Charletra Sharp met with her in the conference room. Both verbally harassed Plaintiff about multiple contracts that were handed off to her, even though she had no control regarding these contracts, as HUD processing requirements and approval were needed to complete them. Johnson accused Plaintiff of having her head buried in the sand, and that Plaintiff needed to make additional arrangements for her kids because Johnson required Plaintiff to work late, even though Plaintiff had approved arrangements for years to leave the office at 4:30 p.m. everyday to pick up her children from childcare. At this meeting, Johnson also wrongfully accused Plaintiff of not being at work on a past day, even when she had substantiating information adducing that she was there and two peers attested to the same. During this slew of made-up accusations, Johnson spoke in a loud and stern tone for the obvious purpose of harassing Plaintiff.

3.11	As further evidence of retaliation, there was an incident when Plaintiff was late to work one morning due to a major accident on Highway 75 in which there were fire trucks and emergency vehicles across all the lanes from the HOV to the service road due to inclement weather. Plaintiff had left early that morning and took pictures of the traffic to show to Johnson. Johnson told Plaintiff that this was unacceptable; however, Johnson proved to be maintaining a double standard when nothing was told to Angela Caudillo when she had car problems or was stuck in traffic. Karen Menard, Supervisor in the Water Department, admitted that Johnson's behavior was in retaliation, since herself and most of her staff was late as well and she did not admonish them. Additionally, Lakesha Baylor sent Plaintiff a policy regarding inclement weather that proved Johnson's overreaction was retaliation.

3.12.	On or about December 3, 2018, Ms. Johnson advised Plaintiff and her colleague Ms. Lori Davidson ("Ms. Davidson"), a White lady, that they would be splitting the duties of others who had recently left the department, leaving Plaintiff and Ms. Davidson to now do the work of five people. Ms. Johnson also informed Plaintiff and Ms. Davidson that they would be assuming the duties of the former Agenda Coordinator as well. However, Plaintiff's salary was never raised to compensate for the additional duties, leaving a pay gap of roughly $25,000 in Ms. Davidson's favor, despite Plaintiff having equivalent education to and five years more experience than Ms. Davidson.

3.13	Johnson again denied equal pay for Plaintiff. Instead, she announced that they would both be assuming Agenda Coordinator duties, even though these duties are classified as a different position and pay grade all together. Agenda Coordinators did not perform the same duties as Plaintiff's role, and yet Plaintiff was expected to assume this role without being payed for it: an unjust employment practice. Lori Davidson was also treated vastly different from Plaintiff. When

they both had contracts stuck in Environment Reviews, awaiting action by HUD for them both to continue the process, only Plaintiff was singly chastised. One day, Johnson stood at Plaintiff's desk and tapped her basket of contracts while saying with a smile: "this needs to be completed before you leave, this needs to be completed ASAP". She continued to stay at Plaintiff's desk harassing her even though Johnson knew that those tasks would take days to complete. Johnson told the other staff not to assist Plaintiff with tasks, even if they required information from them, because the work was now transferred to Plaintiff. On two occasions, Johnson also assigned Plaintiff work on the weekend when the City is off and chastised Plaintiff for not having it complete when the City is closed on the weekends. White co-worker Lori Davison was not subjected to this treatment.

3.14.   In and following January 2019, Plaintiff was still using intermittent FMLA leave for medical appointments and therapy, leaving once per week at 2:00 pm to make her standing 3:00 pm appointment on time. Plaintiff was written up multiple times for leaving early for these appointments and for coming in late due to reactions to prescribed medications. Since these absences were covered by the FMLA, they were legally required and therefore were also *de facto* reasonable accommodations protected under the FMLA.

3.15.   On January 29, 2019, Plaintiff submitted a written complaint to City Manager T.C. Broadnax ("Broadnax") regarding persistent harassment and retaliation Plaintiff was receiving from higher ups. Broadnax instructed HR to address the issue, yet nothing was resolved.

3.16.   On February 26, 2019 Plaintiff was issued a letter by the City of Dallas regarding her attendance. Plaintiff noticed that some days they marked were days she would go to FMLA counseling and the false date that she allegedly left early, even though she was in the office. She

refused to sign it, and had her doctor send an attendance record to prove her location. However, the letter was not rescinded.

 3.17. On or about March 1, 2019, Plaintiff suffered difficulty breathing and swollen eyes and face after a coworker sprayed pesticide near Plaintiff's desk. Plaintiff had to leave work to seek immediate treatment and incurred $400 in prescription costs as a result. Upon Plaintiff's return to work, she met with Ms. V. Jones and Assistant City Manager Nadia Chandler-Hardy, who listened but did nothing. None of Plaintiff's requested accommodations were ever implemented. Plaintiff applied for workers' compensation benefits for the incident but was denied.

 3.18. In March 2019, Plaintiff filed a complaint with HR regarding the harassment and hostile work environment she was experiencing. A meeting was held with Plaintiff and an investigation was promised, but Plaintiff was never informed of the results and never knew if an investigation even took place. To all appearances, nothing was done.

 3.19. Also in March 2019, Plaintiff discovered that her requests for accommodations were being shared via email with people who did not need to see them. Further, Plaintiff was informed by Ms. Davidson that Ms. Johnson had instructed others in the department not to assist Plaintiff with the new contracts she had been assigned, should Plaintiff ask them for background or other information.

 3.20. On or about March 27, 2019, a new Contract Solutions Specialist was hired, and Plaintiff was tasked with training her, in addition to all of Plaintiff's other duties. However, in early April, the new hire sprayed a cleaning aerosol near Plaintiff, and Plaintiff had to be transported by EMS to Baylor Hospital and missed nearly a week of work recovering. Plaintiff filed for workers' compensation benefits but was denied and was told to take sick and vacation days instead.

3.21.   On May 19, 2019, Plaintiff submitted another written complaint to Broadnax regarding the incidents of being made ill at work and the lack of accommodations, which, had they been implemented, could have prevented those incidents. Broadnax replied that he was, once again, referring the matter to HR.

3.19.   On June 14, 2019, the day after another of Plaintiff's FMLA-approved appointments, Plaintiff reported for work as usual only to find that her access card had been disabled. Security let her in, and she was subsequently emailed by Department Director Monica Hardman ("Ms. Hardman"), who requested Plaintiff meet with her to discuss contracts. Instead, Plaintiff was met by Hardman and HR Generalist Kerri Williams. Ms. Hardman handed Plaintiff a discharge document and told her to sign it. The document and the ladies present offered no reason for Plaintiff's termination, and, in fact, Ms. Hardman and Ms. Williams refused to answer Plaintiff when she asked why she was being terminated.

3.20   While Plaintiff was on her way home, one of her peers, City employee Maria Verduzco, contacted her and informed her that Johnson was running around the office saying that she was so glad Plaintiff was fired so that they can spray what they want in the office with no complaints.

3.21   Plaintiff timely filed a Charge of Discrimination with the EEOC on January 18, 2020 alleging race, disability and retaliation discrimination.

## IV.

## First Count

## <u>Title VII Race Discrimination</u>

4.01   Plaintiff incorporates the foregoing provisions as though set forth herein verbatim.

4.02   Plaintiff is an African American female who worked for the City for approximately nineteen years before she was terminated.

4.03　　Defendant City of Dallas is a municipality subject to Title VII.

4.04　　Defendant has intentionally discriminated against Plaintiff because of her race by exhibiting bias against Plaintiff, treating Plaintiff in a discriminatory and harassing manner compared with her white peers and refusing to grant equal and fair pay, and discharging Plaintiff.

4.05　　Plaintiff has filed a charge of discrimination with the EEOC and received a "right to sue" letter.

4.06　　Defendant engaged in a single continuous course of conduct of discrimination against Plaintiff because of Plaintiff's race, and because Plaintiff complained about such discrimination.

4.07　　Such discrimination by Defendant against Plaintiff was intentional. Accordingly, Plaintiff is entitled to recover damages from Defendant for back pay, front pay, benefits, future pecuniary losses, including retirement pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, other non-pecuniary losses and compensatory damages under federal law. Plaintiff is also entitled to recover all costs of court and attorney's fees.

## V.

## Second Count

### Retaliation under Title VII

5.01　　Plaintiff incorporates the foregoing provisions as though set forth herein verbatim.

5.02　　Plaintiff is an African American female who worked for the City for approximately nineteen years before she was terminated. She had previously asserted her rights under a lawsuit alleging gender and race discrimination. Although she lost the lawsuit, her claim was protected activity under Title VII which protects her from retaliation.

5.03　　Defendant City of Dallas is a municipality subject to Title VII.

5.04    Defendant has intentionally discriminated against Plaintiff for bringing the earlier claim by exhibiting bias against Plaintiff, treating Plaintiff in a discriminatory and harassing manner compared with her peers, and discharging Plaintiff.

5.05    Plaintiff has filed a charge of discrimination with the EEOC and received a "right to sue" letter.

5.06    Defendant engaged in a single continuous course of conduct of discrimination against Plaintiff because Plaintiff complained about such discrimination.

5.07    Such discrimination by Defendant against Plaintiff was intentional. Accordingly, Plaintiff is entitled to recover damages from Defendant for back pay, front pay, benefits, future pecuniary losses, including retirement pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, other non-pecuniary losses and compensatory damages under federal law. Plaintiff is also entitled to recover all costs of court and attorney's fees.

## VI.

## Third Count

### Disability Discrimination & Retaliation

6.01    Plaintiff incorporates the foregoing paragraphs by reference as if set forth verbatim herein.

6.02    Defendant is an "employer" within the meaning of the ADA. Plaintiff filed a charge of discrimination with the EEOC and has since received a "right to sue letter." Plaintiff files this action within 90 days of actual receipt of her "right to sue" letter.

6.03    Plaintiff suffers from a disability under the statutory definition provided in the ADA and the Rehabilitation Act because Plaintiff had an actual impairment, a record of impairment, and/or was regarded as having impairment by Defendant. Plaintiff had or was

regarded as having a disability that substantially limited one or more major life functions, and was in fact under the care of her physicians and the Dallas VA. She engaged in protected activity by requesting reasonable accommodations for her various conditions as described above.

6.04    Plaintiff was and is a qualified individual for the job in question.  With reasonable accommodations, Plaintiff can and did perform the essential functions of her job for approximately nineteen years. Defendant refused to engage in good faith in the interactive process with Plaintiff to determine reasonable accommodations and fired her rather than provide accommodations including attending doctor and VA appointments which were protected under the FMLA. The requested accommodations would not have been an undue burden on Defendant. It is evident that these accommodations are reasonable, since Plaintiff worked in the same building for 19 years and had no issues.

6.05    Many adverse employment actions were taken against Plaintiff on account of her disability and requests for accommodations. Even though only silence was the only answer given for her reasons of discharge, in the past her supervisors had harassed her about her attendance, formally requesting accommodations for her disabilities, and taking medical leave for her necessary medical treatment.

6.06    Plaintiff was treated less favorably than non-disabled employees. It is apparent that Defendant discriminated against Plaintiff because other workers were given accommodations that Plaintiff was never considered for, even though Plaintiff had a legitimate disability and doctor's notes requesting accommodations.

6.07    Defendant violated the ADA by discharging Plaintiff and/or discriminating against Plaintiff in connection with compensation, terms, conditions or privileges of employment because of Plaintiff's record of, actual or perceived disability.  It further violated the ADA by

maintaining a hostile work environment, by refusing to provide reasonable accommodations, and by refusing to engage meaningfully in the interactive process.

6.08   Such discrimination by Defendant against Plaintiff was intentional.  Accordingly, Plaintiff is entitled to recover damages from Defendant for back pay, front pay, past and future pecuniary losses, retirement pay, emotional pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.  Further, this discrimination was done with malice or with reckless indifference to Plaintiff's protected rights.  Plaintiff is therefore also entitled to recover punitive damages.

6.09   Plaintiff is entitled to an award of attorney's fees, expert fees, and costs under the ADA.

## VII.

## Jury Demand

8.01.   Plaintiff demands trial by jury of all claims alleged herein to which she is entitled.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff has and recovers the following relief against Defendant:

1. Judgment for back pay and front pay and all past and future lost fringe benefits;

2. Judgment for actual damages in the amount of past and future lost earnings and benefits, and damages to past and future earnings capacity;

3. Compensatory damages for the humiliation, damage to reputation, mental and emotional distress, and pain and suffering Plaintiff have experienced and endured as a result of the discriminatory actions of Defendant;

4. The costs and expenses incurred by Plaintiff in seeking new employment;

5. Damages for past and future mental anguish and emotional distress, inconvenience, loss of enjoyment of life, and damages to reputation;

6. Economic and reliance damages;

7. Prejudgment and post-judgment interest at the maximum legal rate;

8. Exemplary damages;

9. Attorneys' fees;

10. Expert's fees;

11. All costs of court; and

12. Such other and further relief to which Plaintiff may be justly entitled.

Dated: this 8th day of July, 2022.

                                                      Respectfully submitted,

**KILGORE & KILGORE, PLLC**

By: /s/ John H. Crouch, IV
John H. Crouch, IV
State Bar No. 00783906
jhc@kilgorelaw.com

3141 Hood Street, Suite 500
Dallas, Texas 75219
(214) 969-9099- Telephone
(214) 953-0133 – Facsimile

**ATTORNEYS FOR PLAINTIFF**