IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JACQUELINE JONES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:22-cv-1477-L |
| | § | |
| CITY OF DALLAS, TEXAS, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Defendant City of Dallas, Texas (the "City") has filed a motion for summary judgment, *see* Dkt. No., 21, which United States District Judge Sam A. Lindsay has referred to the undersigned United States magistrate judge for hearing, if necessary, and proposed findings and recommendations, *see* Dkt. No. 44.

Plaintiff Jacqueline Jones filed a response, *see* Dkt. No. 38, and the City filed a reply, *see* Dkt. No. 42.

For the following reasons, the Court should grant the motion.

**Background**

Jones was terminated from her employment after nineteen years working for the City. She sues the City under Title VII for unequal pay discrimination and retaliation for filing a prior lawsuit and under the ADA for failure to accommodate and retaliation for seeking reasonable accommodations for her disabilities.

The City moves for summary judgment on all of Jones's claims.

-1-

## Legal Standards

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual "issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003). "A factual dispute is 'genuine,' if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997).

If the moving party seeks summary judgment as to his opponent's claims or defenses, "[t]he moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "Summary judgment must be granted against a party

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which it will bear the burden of proof at trial. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (cleaned up).

"Once the moving party meets this burden, the nonmoving party must set forth" – and submit evidence of – "specific facts showing a genuine issue for trial and not rest upon the allegations or denials contained in its pleadings." *Lynch Props.*, 140 F.3d at 625; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *accord Pioneer Expl.*, 767 F.3d at 511 ("[T]he nonmovant cannot rely on the allegations in the pleadings alone" but rather "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." (cleaned up)).

The Court is required to consider all evidence and view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party and resolve all disputed factual controversies in favor of the nonmoving party – but only if the summary judgment evidence shows that an actual controversy exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Pioneer Expl.*, 767 F.3d at 511; *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005); *Lynch Props.*, 140 F.3d at 625. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor. While the court must disregard evidence favorable to the moving party that the jury is not required to believe, it

gives credence to evidence supporting the moving party that is uncontradicted and unimpeached if that evidence comes from disinterested witnesses." *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 942-43 (5th Cir. 2015) (cleaned up). And "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden, *Little*, 37 F.3d at 1075; *accord Pioneer Expl.*, 767 F.3d at 511 ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." (cleaned up)). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (cleaned up).

Rather, the non-moving party must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the

movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

And "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Pioneer Expl.*, 767 F.3d at 511 (cleaned up). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott*, 550 U.S. at 380 (cleaned up). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

"After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *DIRECTV, Inc. v. Minor*, 420 F.3d 546, 549 (5th Cir. 2005) (cleaned up). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (cleaned up).

The Court will not assume "in the absence of any proof ... that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075. "Rule 56 does not impose upon the district court a duty to sift through the record in

search of evidence to support a party's opposition to summary judgment," and "[a] failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (cleaned up).

If, on the other hand, "the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). The "beyond peradventure" standard imposes a "heavy" burden. *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:04-cv-1866-D, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007). The moving party must demonstrate that there are no genuine and material fact disputes and that the party is entitled to summary judgment as a matter of law. *See, e.g.*, *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). On such a motion, the Court will, again, "draw all reasonable inferences in favor of the non-moving party." *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002).

## Analysis

I.    The Court should grant summary judgment because Jones failed to exhaust <u>administrative remedies as to all but one of her claims.</u>

Jones was required to exhaust administrative remedies before she could sue the City under Title VII and the ADA.

A.    <u>Jones failed to exhaust administrative remedies under Title VII.</u>

Before a plaintiff can file a suit in federal court alleging employment discrimination under Title VII, she must exhaust her administrative remedies. She exhausts those remedies by filing a timely charge with the EEOC, or with a state or local agency with authority to grant or seek relief from the alleged unlawful employment practice. Exhaustion occurs when [a] plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue. The filing of an EEOC charge is a precondition to filing suit in district court.

*Reed v. Fas Pac Store*, No. 7:18-cv-164-O-BP, 2020 WL 853908, at *3 (N.D. Tex. Feb. 4, 2020) (cleaned up).

"The purpose of this exhaustion doctrine is to facilitate the administrative agency's investigation and conciliatory functions and to recognize its role as primary enforcer of anti-discrimination laws. Administrative exhaustion is important because it provides an opportunity for voluntary compliance before a civil action is instituted. For this reason, Title VII requires administrative exhaustion." *See Davis v. Fort Bend Cnty.*, 893 F.3d 300, 307 (5th Cir. 2019) (cleaned up); *see also, e.g., Taylor v. Lear Corp.*, No. 3:16-cv-3341-D, 2017 WL 6209031, at *2 (N.D. Tex. Dec. 8, 2017) ("It is well settled that courts may not entertain claims brought under Title VII as to which an aggrieved party has not first exhausted [her] administrative remedies by filing a charge of discrimination with the EEOC." (cleaned up)).

But "[t]hese restrictions are not jurisdictional limitations on [a federal court's] ability to hear the case; rather they are claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain

procedural steps at certain specified times." *Cotton v. Russell*, 830 F. App'x 145, 147 (5th Cir. 2020) (per curiam) (cleaned up).

To determine "whether a plaintiff has exhausted a particular claim, [the Fifth Circuit has] noted that 'the scope of an EEOC complaint should be construed liberally.'" *Patton v. Jacobs Eng'g Group, Inc.*, 874 F.3d 437, 443 (5th Cir. 2017) (quoting *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006)).

But this construction must be weighed against Title VII's goal of "trigger[ing] the investigatory and conciliatory procedures of the EEOC, in attempt to achieve non-judicial resolution of employment discrimination claims." *Pacheco*, 448 F.3d at 788-89.

So, to attain a balance between the two, courts in this circuit interpret

"what is properly embraced in review of a Title-VII claim somewhat broadly, not solely by the scope of the administrative charge itself, but by the scope of the EEOC investigation which 'can reasonably be expected to grow out of the charge of discrimination.'" *Id*. at 789 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)). "[Courts should] engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label." *Id*.

*Patton*, 874 F.3d at 443.

Jones filed a charge of discrimination with the EEOC on January 18, 2020, based on race, retaliation, and disability:

Co-worker Lori Davidson (White) and I were both promoted to Contract Solutions Specialists in or around August of 2018. I complained to HR, Nina Arias (on or around September 2019) about the unequal pay and nothing was done. Lori Davidson was being paid $86K and I was being paid $61,171 and we were in the same positions. I also asked and

submitted multiple of reasonable accommodation requests and I received no response, no interactive process took place, and nothing was done. I was terminated in June 14, 2019 in retaliation because of my complaints of unequal pay and requests for reasonable accommodations.

I believe that I was discriminated against because of my Race (African American/Black), in violation of Title VII of the Civil Rights Act of 1964, as amended. I believe that I was retaliated against in violation of Section 704(a) of Title VII of the Civil Rights Act of 1984, as amended. I believe that I was discriminated against based on disability, in violation of the Americans with Disabilities Act of 1990. I believe that I was retaliated against in violation of Section 503(a) of the Americans with Disabilities Act of 1990, as amended.

Dkt. No. 23-2 at 3 (App. 127-28). Jones was issued right to sue letters on April 11, 2022, authorizing her to sue under the Title VII and the ADA. *See id*. at 6-7 (App. 130-31). She sued the City on July 8, 2022. *See* Dkt. No. 1.

Jones failed to exhaust administrative remedies for race-based discrimination claims under Title VII except for her discrimination claim based on unequal pay.

In her charge, Jones stated that she was paid less than another employee in the same position, who was White. Other than the generic statement that she believes that she was discriminated against because of her race in violation of Title VII, she makes no further allegations regarding any discriminatory treatment based on race in her charge.

But, in her Complaint, Jones alleges that the City discriminated against her "by exhibiting bias against Plaintiff, treating Plaintiff in a discriminatory and harassing manner compared to her white peers and refusing to grant equal and fair pay, and discharging Plaintiff." Dkt. No. 1 at ¶ 4.04.

-9-

Liberally construed, the charge sets out discrimination based on race as to pay, but no investigation into any other race-based discrimination could reasonably be expected to emerge from the substance of the charge.

Because Jones failed to specify the facts underlying the allegations of racial discrimination other than unequal pay, she failed to exhaust administrative remedies as to any other race-based discrimination claim. *See Doe v. Merritt Hosp., LLC*, 353 F. Supp. 3d 472, 480 (E.D. La. 2018) (finding sexual harassment claim unexhausted because the plaintiff failed to provide facts explaining the claim); *Williams v. Health Tx. Provider Network*, No. 3:16-cv-391-M-BK, 2017 WL 2608813, at *3 (N.D. Tex. June 1, 2017) (collecting cases and finding that plaintiff did not exhaust retaliation claim because he failed to include facts concerning the allegation or the employment practice he opposed).

Jones failed to exhaust administrative remedies for Title VII retaliation.

In her charge, Jones alleges that she was retaliated against because of her complaints of unequal pay and requests for reasonable accommodations.

But, in her Complaint, she alleges that she was terminated in retaliation for bringing a prior lawsuit alleging gender and race discrimination. *See* Dkt. No. 1 at ¶¶ 5.02, 5.04. She does not allege in the Complaint that she was retaliated against for complaints of unequal pay or requests for accommodations. *See id*. at 10-11.

And, so, there is nothing in the charge which would lead the EEOC to investigate the retaliation claim based on filing a prior lawsuit.

B.    Jones failed to exhaust administrative remedies under the ADA.

-10-

The administrative exhaustion requirement also applies to claims under the ADA. *See Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir. 1996) ("[A]n employee must comply with the ADA's administrative prerequisites prior to commending an action in federal court against her employer for violation of the ADA."); 42 U.S.C. § 12117; *see also Melgar v. T.B. Butler Publ'g Co., Inc.*, 931 F.3d 375, 378-79 (5th Cir. 2019) ("To bring a suit under Title VII, the ADA (disability), or the ADEA (age), a complainant must file a charge of discrimination with the EEOC to exhaust his administrative remedies.").

Jones failed to exhaust administrative remedies for failure to accommodate disabilities or for retaliation for seeking reasonable accommodations under the ADA.

Requests for accommodation are discrete acts, and each request must be independently exhausted. *See Henson v. Bell Helicopter Textron, Inc.*, 128 F. App'x 387, 391 (5th Cir. 2005); *Profit v. Klein Indep. Sch. Dist.*, Civ. No. H-14-0850, 2015 WL 3866720, at *9-*10 (S.D. Tex. June 23, 2015).

And a request for an accommodation based on a particular condition will not exhaust a request for an accommodation for a different condition. *See Drake v. Spring Indep. Sch. Dist.*, No. 20-20376, 2021 WL 3176081, at *4 (S.D. Tex. July 27, 2021) (holding exhaustion of one incident of failure to accommodate did not exhaust a separate incident); *Henderson v. City of Dallas*, No. 3:16-cv-3317-S, 2018 WL 4326936, at *10 (N.D. Tex. Sept. 10, 2018) (granting summary judgment for failure to accommodate claims that were not included in the EEOC charge).

In her charge, Jones states that "I also asked and submitted multiple of

reasonable accommodation requests and I received no response, no interactive process took place, and nothing was done." Dkt. No. 23-2 at 3 (App. at 127). She does not include facts regarding her disability, her requested accommodation, or when she requested an accommodation. *See id.*

But, in her Complaint, Jones alleges that the City failed to accommodate her requests premised on asthma, allergies, PTSD, knee issues, and other chronic conditions, with accommodation requests including a new desk, a different facing seating arrangement, a private office, working from home, and leave from work. *See* Dkt. No. 1 at ¶¶ 3.07, 3.08.

And, so, there is not enough in the charge to lead the EEOC to investigate the alleged failure-to-accommodate or retaliation for seeking reasonable accommodations asserted in the Complaint.

And Jones's ADA charge was untimely because it was filed more than 300 days after the date of the alleged failure to accommodate.

A plaintiff must file a charge of disability discrimination with the EEOC within 180 days of the illegal act or within 300 days if she has filed a complaint with the state or local agency and received a statutory right-to-sue letter from the EEOC before filing suit in federal court. *See Ellis v. Educ. Comm'n for Foreign Med. Graduates*, Civ. No. A. H-14-2126, 2015 WL 3866728, at *6 (S.D. Tex. June 23, 2015 (citing 42 U.S.C. § 2000e-5(c)(1)). The City proffered its alternative accommodations to Jones's request on December 19, 2018, which she declined on December 21, 2018. *See* Dkt. No. 23-13 at 21 (App. 635). Jones filed her charge on January 18, 2020 –

more than 300 days later.

Jones also failed to exhaust administrative remedies to the extent that she asserts a claim for discrimination under the ADA.

In her charge, Jones summarily states that she believed that she was discriminated against based on disability in violation of the ADA. *See* Dkt. No. 23-2 at 3-4 (App. at 127-28). She further states that she was terminated "in retaliation because of my complaints of unequal pay and requests for reasonable accommodations" but says nothing about discrimination based on her disabilities. *Id.* at 3 (App. at 127).

But failure to accommodate, disparate treatment, and retaliation "represent distinct categories of disability discrimination under the ADA." *Hamar v. Ashland, Inc.*, 211 F. App'x 309, 310 (5th Cir. 2006) (analyzing failure to accommodate and disparate treatment claims). The EEOC cannot reasonably have been expected, when presented with a claim alleging retaliation under the ADA, to investigate a distinct claim for discrimination under the ADA.

And, in her Complaint, Jones uses the term "discrimination" but does not allege any facts that would distinguish her discrimination claim under the ADA from her retaliation claim. And, so, it is unclear whether she asserts a disability discrimination claim – but, if she does, she has failed to exhaust administrative remedies as to that claim. And Jones does not respond to the City's arguments that she failed to exhaust administrative remedies before filing this lawsuit.

Because Jones fails to raise an issue of material fact regarding exhaustion of

administrative remedies, all her claims except the Title VII racial discrimination claim based on unequal pay should be dismissed with prejudice. *See Gonzalez v. Pan American Labs*, No. 3:14-cv-2787-L, 2017 WL 4758672, at \*10 n.6 (N.D. Tex. Oct. 20, 2017).

II.    <u>The Court should grant summary judgment on the exhausted Title VII claim.</u>

In the absence of direct evidence of discrimination, Title VII claims are analyzed under the three-step *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705-06 (5th Cir. 2016).

The plaintiff must first show a prima facie case of race discrimination. *See McDonnell Douglass*, 411 U.S. at 802.

And, if the plaintiff establishes a prima facie case of race discrimination, the burden of production then shifts to the employer to state a legitimate, non-discriminatory or non-retaliatory reason for the employment action at issue. *See id.*

If the employer meets it burden, the burden then shifts back to the plaintiff to offer evidence that the employer's stated reason was only pretext for discrimination, or there was a mixed motive. *See Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir 2016) (citing *McDonnell Douglas*, 411 U.S. at 804).

To establish a prima facie case of pay discrimination under Title VII, a plaintiff must show (1) "that he was a member of a protected class," (2) "that he was paid less than a non-member," and (3) "that his circumstances are 'nearly identical'

to those of the better-paid non-member." *Taylor v. United Parcel Services, Inc.,* 554 F.3d 510, 522 (5th Cir. 2008). After the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer non-discriminatory reasons for the pay disparity. *See id.* at 522.

Without more, job titles and descriptions are insufficient evidence that the employees' circumstances are nearly identical. *See Lindsley v. TRT Holdings Inc.,* No. 3:17-cv-2942-X, 2022 WL 824834, at *4 (N.D. Tex. Mar. 18, 2022). The job content and actual job requirements, not the job title, classification, or description, are determinative. *See Montgomery v. Clayton Homes Inc.,* 65 F. App'x 508 (5th Cir. 2003) (citing *E.E.O.C. v. Hernando Bank, Inc.,* 724 F.2d 1188, 1196 (5th Cir. 1984)).

Jones's sole comparator is Lori Davidson. Jones is Black. Davidson is White. Both held the title of Contract Solutions Specialist, but Davidson was paid more than Jones.

Jones fails to show that their circumstances were nearly identical.

Davidson's position was grant-funded, meaning that her entire salary was paid from federal grant funds that she administered. *See* Dkt. No. 23-3 at 27 (App. at 164).

And, based on the work actually performed, Davidson's job duties were not the same as Jones's. In addition to the same duties performed by Jones, Davidson performed additional job duties. She staffed boards and commissions, including the community advisory board through the planning department. She was considered a subject matter expert regarding HUD regulations. To complete her duties and

responsibilities, Davidson routinely worked twelve-hour days. *See id*. at 28-30 (App. at 165-67). In contrast, Jones "worked her shift" and left. *See id*. at 29 (App. at 166).

Davidson was hired by the City in November 2003 as a Senior Contract Compliance Administrator. *See* Dkt. No. 23-1 at 115 (App. at 115). In January 2011, she was promoted to Coordinator III. *See id*. at 96-07 (App. at 96-97). The position was eventually reclassified to Contract Solutions Specialist on October 1, 2018. *See id.* at 89 (App. at 89).

Jones was hired by the City on October 1, 2000, as a Management Assistant. *See* Dkt. No. 23-8 at 6-7 (App. at 479-80). She was reassigned to the position of Contract Compliance Administrator in April 2005, *see* Dkt. No. 23-1 at 65-66 (App. at 65-66), and later reassigned to the position of Contract Solutions Specialist on October 1, 2018, *see id*. at 59 (App. at 59).

Neither Jones's nor Davidson's pay was affected by their reclassification to the position of Contract Solutions Specialist because the City's procedures provide that employees who are reclassified will not receive a change in pay unless their pay would fall below the salary range for the reclassified position. *See id*. at 2 (App. at 2).

Because Jones and Davidson were hired approximately three years apart, into different positions, and held different positions until their reclassifications on October 1, 2018, and, although they held the same title but had different job duties, their circumstances are not "nearly identical," and Jones cannot state a prima facie case by using Davidson as a comparator.

But, even if she could, the City has articulated legitimate, non-discriminatory

reasons for the pay differential between Jones and Davidson, and Jones does not offer any evidence showing those reasons are pretextual.

As discussed above, Davidson was paid more than Jones because Davidson's position was grant-funded, Davidson worked longer hours and had more responsibilities than Jones, and Davidson's career trajectory was not comparable to Jones's. And Davidson's educational background and experience exceeded Jones's, and Davidson's job performance was substantially better than Jones's both historically, leading to differences in merit raises, and when Jones was terminated.

As to education, both Jones and Davidson had master's degrees in public administration. But Davidson also had a law degree and was a certified public accountant. *See id*. at 86 (App. at 86).

As to experience, on January 26, 2011, Davidson was promoted, through a competitive process, to the position of Coordinator 3, grade I, resulting in an 8% salary increase, in accordance with the City's procedures. *See id*. at 96-97 (App. at 96-97). So Davidson held a higher-grade position with the City than Jones from 2011-2018.

As to merit and performance, Davidson, throughout her tenure with the City, consistently received higher performance ratings than Jones, frequently resulting in a higher merit increase percentage than Jones. *See id*. at 98-112, 116-24 (App. at 98-112, 116-24). A sufficient showing of a significant difference in the quality of job performance constitutes a legitimate nondiscriminatory reason for the employer's action in rebuttal of the prima facie case. *See Pittman v. Hattiesburg Mun. Separate*

-17-

*Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. 1981).

Jones's performance appraisal ratings have, with two exceptions, consistently been "Fully Successful," typically resulting in a 3% merit increase, when available. *See id.* at 3, 60-72, 78-81 (App. at 3, 60-72, 78-81). In fiscal year 2007-2008, Jones received a "Partially Successful" rating, resulting in a 2% merit increase, and in fiscal year 2009-2010, Jones received a "Highly Successful" rating, but, for this review period, civilian employees did not receive a merit increase due to budgetary issues and instead received a pay reduction. *See id.* at 3 (App. at 3).

Davidson was consistently rated as "Distinguished," "Exceptional," "Superior," and "Highly Successful." *See id.* at 98-112, 116-24 (App. at 98-112, 116-24). These ratings often resulted in merit percentage increases of between 4-6%. On one occasion, Davidson was rated "Distinguished, and then some," resulting in an 8% merit increase. *See id.* at 103-04 (App. at 103-04). Over time, the difference in merit percentage increases compounded, making up a substantial portion of the salary differential. *See id.* at 3 (App. at 3).

The City has satisfied its burden of production to articulate legitimate, non-discriminatory reasons for why Davidson was paid more than Jones, and Jones does not rebut those reasons.

The Court should grant summary judgment on Jones's Title VII claim for race discrimination based on pay.

And, because Jones did not exhaust her administrative remedies on her other claims, all of Jones's claims should be dismissed with prejudice.

-18-

III.   Only in the alternative, the Court should grant summary judgment based on the City's other arguments.

The undersigned will also address below the City's other arguments for summary judgment on each of Jones's claims but only in the alternative because, if the Court disagrees with the undersigned's primary recommendation above, the Court will need to reach these arguments as to Jones's claims.

A.   The Court should grant summary judgment on the Title VII retaliation claim.

Since Jones presents no direct proof that the City retaliated against her for filing a prior lawsuit, the *McDonnell Douglas* burden-shifting analysis applies. *See Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001) (citing *Portis v. First Nat'l Bank*, 34 F.3d 325, 328 (5th Cir. 1994) (holding that *McDonnell Douglas* applies when plaintiff has presented only circumstantial evidence of retaliatory animus)).

To state a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that (1) she engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse employment actions. *See Walker v. Norris Cylinder Co.*, No. 3:03 CV 1009 D, 2005 WL 2278080, at *9 (N.D. Tex. Sept. 19, 2005).

If the plaintiff establishes a prima facie case of retaliation, the burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for the alleged retaliatory action taken. *See id.*

-19-

If the employer meets its production burden, the plaintiff must adduce evidence that would permit a reasonable trier of fact to find that "her termination ... would not have occurred 'but for' her protected conduct." *Montemayor,* 276 F.3d at 692.

"At the summary judgment stage, the nonmovant need only point to the existence of a genuine issue of material fact." *Gee v. Principi,* 289 F.3d 342, 345 (5th Cir.2002). "The ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a 'but for' cause of the adverse employment decision." *Long v. Eastfield Coll.,* 88 F.3d 300, 305 n.4 (5th Cir.1996).

Jones fails to show that there was a causal link between the alleged protected activity – filing a prior lawsuit against the City – and the alleged retaliatory action – termination. Monica Hardman, the Managing Director of the Office of Homeless Solutions, was the decision maker who terminated Jones. *See* Dkt. No. 23-3 at 4 (App. at 141). She had no knowledge of Jones's prior lawsuit. *See id.* at 9 (App. 146).

If a decision maker has no knowledge of the protected activity, there can be no causal link. *See Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001) ("A 'causal link' is established when the evidence demonstrates that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity." (cleaned up)); *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct.").

The length of time between Jones's protected activity and the termination of her employment also negates causation. Jones served the City with her prior lawsuit on August 9, 2016, almost three years prior to her termination. *See Jones v. City of Dallas, Texas,* No. 3:16-cv-2303 (N.D. Tex. filed Aug. 9, 2016), Dkt. No. 1. The date on which Jones served the City with her prior lawsuit is the date she engaged in protected activity. *See Atkins v. Southeast Community Health Sys.*, 712 F. App'x 388, 391 (5th Cir. 2017). Lapses of five and ten months have been held to be too remote to show a causal link. *See id.*

Also, as discussed below, Jones's supervisor, Erika Johnson – who is not alleged to have engaged in protected activity – was terminated on the same day and for the same reasons as Jones. And, so, Jones cannot show that her prior lawsuit was the but-for reason for her termination when her supervisor was fired for the same conduct.

But, even if Jones could show a causal link, the City has articulated legitimate non-discriminatory reasons for terminating Plaintiff, and Jones does not offer evidence to show those reasons were retaliatory.

As a Contract Solutions Specialist, Jones had responsibility for conducting monitoring visits for her contracts and submitting reports. *See* Dkt. No. 23-8 at 19-21, 29-31 (App. 492-494, 502-504). Jones acknowledged that she had these responsibilities and had not performed the required monitoring visits. *See* Dkt. No. 23-3 at 101-102 (App. 238-239), 168-171 (App. 305-308), 182-83 (App. 319-320); 23-8 at 19-21, 29-31 (App. at 492-94, 502-504).

On May 7, 2019, Hardman received a letter from the United States Department of Housing and Urban Development ("HUD"). See Dkt. No. 23-3 at 85-88 (App. 222-225), 169 (App. at 169). The letter contained an annual community assessment for the 2017 program year. It identified "Areas Needing Improvement and Recommendations," which included the following:

> ESG Program Expenditure Deadline. Based on drawdown information in IDIS, the city has drawn only 24 percent of its FY 2017 ESG grant of $3,117,540. To meet the 24-month expenditure deadlines, $2,369,861 must be expended by October 19, 2019.

*Id*. at 87 (App. 224). The expenditure shortfall was the only area of improvement cited by HUD for OHS. Chandler-Hardy and Hardman considered the ESG expenditure shortfall "a very serious issue" for OHS because, if the funds were not expended within the allotted timeframe, HUD had the authority to recapture those funds and to reduce the next year's allocation. *See id*. at 31 (App. at 168); Dkt. No 24-4 at 29 (App. at 443). Hardman explained "[s]o its very serious because it impacts the funding that we receive to be able to assist a population that is very critical. These were the funds for persons at risk or experiencing homeless[ness]." Dkt. No. 23-3 at 31 (App. 168). Chandler-Hardy identified the ESG expenditure shortfall as "critical." Dkt. No. 23-4 at 29 (App. at 443).

After receiving the HUD letter, Hardman immediately began working with Johnson and Jones to determine the magnitude of the problem because they were the two staff members that were integrally involved in the specific contracts. *See id*. at 34-35 (App. at 171-172). Jones was the lead project manager through being the

contract solution specialist, and Johnson was her direct supervisor. *See id.* Hardman worked with them to determine if the vendors could expend the funds before the deadline and, if not, what remedy was available to the City so that HUD did not recapture the funds. *See id.* at 34 (App. at 171).

Based on information provided by Jones, Hardman learned that many of the contract partners would not be able to expend the money. *See id.* at 36 (App. at 173). Hardman was "shocked and disappointed because this information shouldn't have been found out this late in the game, in May when the funds had to be expended by October." *Id.* Hardman determined that "[t]his information should have been something that would have been picked up during conversations with the contractors and vendors through our normal contract compliance and monitoring visits." *Id.*

Hardman notified Chandler-Hardy about the ESG expenditure shortfall in a critical issues report on May 22, 2019, as an " immediate issue of concern." *See id.* at 32-34 (App. at 169-171). Hardman investigated the cause of the ESG expenditure shortfall by corresponding with Jones and Johnson, including reviewing voluminous documentation. *See id.* at 37-39 (App. 174-76).

Based on her review of the documentation and her knowledge of the roles and responsibilities within the department, Hardman concluded that Jones and Johnson were responsible for the ESG expenditure shortfall. *See id.* at 40-41 (App. at 177-178). Hardman determined that, had Jones performed routine site monitoring visits, the ESG expenditure shortfall would have been identified and could have been addressed.

-23-

Based on the total disregard of monitoring and the failure to inform Hardman of the expenditure shortfall, Hardman determined that termination of both Jones and Johnson was appropriate. *See id*. at 41 (App. 178). Both Hardman and Chandler-Hardy testified that they were unaware of any mistake by OHS staff that was comparable to the ESG expenditure shortfall. *See id*. at 45 (App. 182); Dkt. No. 23-4 at 46 (App. 460).

The City has satisfied its burden of production to articulate legitimate, non-discriminatory reasons for Jones's termination. And, so, Jones must show a conflict in the substantial evidence as to whether the City would have taken these actions but for her protected activity.

But Jones does not respond to the City's proffered reasons for termination or offer any evidence to show that she was terminated in retaliation for filing the prior lawsuit.

The Court should dismiss Jones's Title VII retaliation claim with prejudice.

B.    The Court should grant summary judgment on the ADA failure-to-accommodate claims.

To prevail on an ADA failure-to-accommodate claim, a plaintiff must show that: "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Milteer v. Navarro Cnty., Tex.*, 652 F. Supp. 3d 754, 762 (N.D. Tex. 2023) (quoting *Feist v. La. Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)

-24-

(cleaned up)).

The ADA defines "disability" as (a) a physical or mental impairment that substantially limits one or more major life activities, (b) a record of such an impairment, or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(1). Under the ADA, to "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

Jones alleges that she has asthma, allergies, and PTSD. The City does not contest Jones's PTSD as a disability at this time but contends that Jones does not have a respiratory disability related to asthma or allergies.

Jones's doctor testified that Jones did not have and did not include asthma as an impairment in the certification that she provided for Jones's request for reasonable accommodation. *See* Dkt. No. 23-12 at 4 (App. 612); Dkt. No. 23-13 (App. 624). The doctor also noted that Jones's anxiety, depression, tension headaches, and allergic rhinitis imposed "no limitation with regard to activities of daily living." Dkt. No. 23-13 (App. 624).

In response, Jones states in her declaration that she "suffered from asthma and was sensitive to sprays." *See* Dkt. No. 37 at 4 (App. 1). But this vague, conclusory statement is not sufficient to raise a material disputed fact on this issue. *See Green v. United Parcel Serv., Inc.*, 847 F. App'x 207, 211 (5th Cir. 2021) (holding

-25-

that it is not enough to simply have an impairment, but that a plaintiff "must demonstrate that the impairment substantially limits a major life activity.").

The City also contends that Jones cannot raise an issue of material fact as to whether she was a qualified individual under the ADA to the extent she claims she could not perform essential functions of her job unless she worked from home.

To be "qualified" under the ADA, Jones must be able to "perform the essential functions" of Contract Solutions Specialist in the City's Office of Homeless Solutions "with or without reasonable accommodation." 42 U.S.C. § 12111(8).

> There is general consensus among courts, including [the Fifth Circuit], that regular work-site attendance is an essential function of most jobs. *See, e.g.*, *Hypes on Behalf of Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (per curiam) (collecting cases); *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (en banc) ("[The] general rule [is] that, with few exceptions, 'an employee who does not come to work cannot perform any of his job functions, essential or otherwise.' " (quoting *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 948 (7th Cir. 2001) (en banc))). This is especially true when the position is interactive and involves a significant degree of teamwork. *Hypes*, 134 F.3d at 727 ("[T]eam work under supervision generally cannot be performed at home without a substantial reduction in the quality of the employee's performance." (alteration in original) (quoting *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995))); *accord Ford Motor Co.*, 782 F.3d at 761 ("[M]ost jobs require the kind of teamwork, personal interaction, and supervision that simply cannot be had in a home office situation." (quoting *Rauen v. U.S. Tobacco Mfg. L.P.*, 319 F.3d 891, 896 (7th Cir. 2003))).

*Credeur v. Louisiana Through Office of Attorney Gen.*, 860 F.3d 785, 793 (5th Cir. 2017).

In 2018-19, OHS procedures precluded working from home other than in an occasional exigent circumstance, which is not something Jones requested. *See* Dkt.

No. 23-3 at 75 (App. 212). And Jones's job descriptions contemplates working in an office environment. *See* Dkt. No. 23-1 at 7 (App. 7).

> Hardman explained that
>
> [a]t the time we did not have any remote working, and it was due to the nature of our business operation. We're a very much externally focused department where we had not only the general public coming in. We had persons at risk or experiencing homelessness coming in to talk to folks. We had vendors and contractors coming in.
>
> Our work was very collaborative, so working not only with other staff but also other staff like planning related to environmental reviews. So the nature of our work, it was not a remote work operational style.

Dkt No. 23-3 at 17-18 (App. 154-155).

In response, Jones states in her declaration that she "believed most or all of [her] job duties could have been performed working from home with suitable computer equipment." Dkt. No. 37 at 11 (App. 8).

But, although courts are mindful that employees can be good sources of information regarding their day-to-day activities and the prerequisites for success on the job, "[a]n employee's unsupported testimony that she could perform her job functions from home" does not create a genuine dispute of fact to preclude summary judgment. *Credeur*, 860 F.3d at 793 (quoting *Ford Motor Co.*, 782 F.3d at 763-64).

Jones also observes that "when Covid-19 hit less than a year later, the City allowed work from home for over a month … and then allowed hybrid work." Dkt. No. 38 at 11. But that does not raise a fact question because it is irrelevant. It occurred after Jones was terminated, and the undersigned takes judicial notice of executive orders issued by Dallas County Judge Clay Jenkins recognizing Covid-19

-27-

as a public health emergency, setting forth social distancing guidelines and limitations on gathering, and specifically recommending minimizing exposure in the workplace through social distancing and telecommuting. *See PNC Bank, N.A v. Ruiz,* No. 22-50584, 2023 WL 340078, at *4 (5th Cir. May 10, 2023) ("Judicial notice may be taken of a fact not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned.").

The summary judgment evidence shows that, in 2018-19, when Jones requested a work-from-home accommodation, in-office work was an essential function of her job. So, to the extent that Jones claims that she could not perform essential job functions working in the office, she cannot show that she was a qualified individual under the ADA.

But, even if Jones was a qualified individual under the ADA, she fails to raise a genuine issue of material fact as to whether the City failed to offer reasonable accommodations.

An employee's request for an accommodation triggers an obligation on behalf of the employer to engage with good faith in an interactive process to identify an appropriate accommodation. *See Jurach v. Safety Vision, LLC,* 642 F. App'x 313, 318 (5th Cir. 2016) (citing *Griffin v. United Parcel Service, Inc.,* 661 F.3d 216, 224 (5th Cir. 2011)).

The purpose of this required interaction is for the parties to identify

reasonably available accommodations. *See id*. (citing *Loulseged v. Akzo Nobel Inc.,* 178 F.3d 731, 735-36 (5th Cir.1999) (explaining the need for a bilateral dialogue due to information asymmetry)). The exact contours of the process are unique to each case. *See id*. An employer is liable when its unwillingness to participate in the process leads to a failure to reasonably accommodate. *See id*. (citing *Griffin,* 661 F.3d at 224.

But "[a]n employer that 'demonstrates good faith efforts' to engage in the interactive process and to make a reasonable accommodation is shielded from liability." *See id*. (cleaned up; citing 42 U.S.C. § 1981a(a)(3))). "The appropriate accommodation need not be the employee's preferred accommodation, and the employer is free to choose the less expensive accommodation or the accommodation that is easier for it to provide." *Thompson v. Microsoft Corp.*, 2 F. 4th 460, 469 (4th Cir. 2021). "An employer satisfies the requirement if it engages in the process in good faith, even if the employee rejects the reasonable accommodations that are offered." *Jurach*, 72 F. Supp. 3d at 709.

In November 2018, Jones met with Human Resources Supervisor Jannis Rusher to discuss her requests for accommodation. See Dkt. No. 23-10 at 1 (App. 602). Jones shared her requests for accommodations with Rusher, who reviewed the documentation. *See id*. Jones's documented restrictions included not being in a high traffic area, not facing a cement wall with holes in it, and not being approached from behind. *See* Dkt. No. 23-13 at 1-2 (App. at 615-16).

Rusher also reviewed pictures Jones provided of her office set up. Rusher

suggested that Jones have her monitor moved to face a different direction, which would resolve the concern of Jones facing a wall and being approached from behind. *See* Dkt. No. 23-10 at 1-2 (App. 602-03). Although Jones did not deny that she could have the monitor reconfigured, she stated that would not be sufficient because the area would still be noisy. *See id.*

Based on Jones's documented restrictions, a different cubicle was identified for Jones, which was further away from traffic and the water fountain, did not face the wall, and would not have Jones's back to the opening. *See* Dkt. No. 23-8 at 40 (App. 513); 23-11 at 2 (App. 605). Jones rejected the offered accommodation.

Jones instead demanded either a private, enclosed office or the ability to work from home. But all the enclosed offices were occupied and assigned to supervisors. *See* Dkt. No. 23-4 at 19 (App. at 433). Under the ADA, an employer is not required to give what it does not have. *See Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir 1997).

And, because working from home was not an option given the essential functions of her job, the City demonstrated good faith in the interactive process to make reasonable accommodations.

The ADA failure to accommodate claim should be dismissed with prejudice.

C.    The Court should grant summary judgment on the ADA retaliation <u>claim.</u>

To show an unlawful retaliation, a plaintiff must establish a *prima facie* case of (1) engagement in an activity protected by the ADA, (2) an adverse employment

action, and (3) a causal connection between the protected act and the adverse action. *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999).

If a plaintiff can prove a prima facie case for disability retaliation, the burden shifts to the defendant to show a non-retaliatory reason for the alleged adverse employment action. *McDonnell Douglas*, 411 U.S. at 802.

If a defendant satisfies its burden, the plaintiff must then show that the defendant's asserted reason was merely pretext for the real retaliatory purpose. *Id.* at 804-05.

Like Title VII retaliation cases, the plaintiff in an ADA retaliation case must ultimately prove that the adverse employment action would not have occurred "but-for" the protected activity, and the plaintiff must reveal a "conflict in substantial evidence on the ultimate issue of retaliation in order to withstand a motion for summary judgment." *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998).

But a plaintiff need not show that she suffers from an actual disability to maintain a retaliation claim under the ADA. *See Tabatchnik v. Cont'l Airlines*, 262 F. App'x 674, 676 (5th Cir. 2008). A reasonable, good faith belief that the statute has been violated will be sufficient. *See id.*

Jones cannot show a causal connection between engaging in protected activity under the ADA and the termination of her employment.

Jones alleges that she engaged in protected activity when she requested reasonable accommodations. Jones requested reasonable accommodations on

November 6, 2018, and Hardman, the decision maker, was aware of her request by December 21, 2018. She was terminated on June 14, 2019.

The operative date for determining the timing for temporal proximity purposes is when the employer became aware of the protected activity. *See Atkins v. Southeast Cmty. Health Sys.*, 712 F. App'x 388, 391 (5th Cir 2017). A five-month lapse in temporal proximity like the one here is insufficient to show a causal connection. *See Molden v. East Baton Rouge Parish Sch. Bd.*, 715 F. App'x 310, 318 (5th Cir. 2017) ("This Court has held that a five-month lapse is not close enough without other evidence of causation.").

Jones also fails to show that she was treated worse than similarly situated employees outside of her protected class or that the City departed from its typical policies and procedures. *See id*. And Hardman, Jones's supervisor who is not alleged to have engaged in protected activity under the ADA, was terminated the same day as Jones and for the same conduct.

And, as discussed above, the City had legitimate, non-retaliatory reasons for terminating Jones's employment.

Jones's ADA retaliation claim should be dismissed with prejudice.

D.    The Court should grant summary judgment on any ADA disability discrimination claim.

As discussed above, it is unclear if Jones is asserting a claim for disability discrimination under the ADA. But, if she is, she cannot establish a prima facie case because neither decision-maker was aware she had a disability, *see* Dkt. No. 23-3 at

21-22 (App. 157-58) (Hardman); Dkt. No. 24-4 at 19 (App. 433) (Chandler-Hardy), and the City had legitimate, non-discriminatory reasons for terminating Jones's employment.

Any disability discrimination claim under the ADA should be dismissed with prejudice.

## Recommendation

The Court should grant Defendant City of Dallas's Motion for Summary Judgment [Dkt. No. 21] and dismiss Plaintiff Jacqueline Jones's claims with prejudice.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. ' 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: June 6, 2024

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE